ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Philips Lighting North American | ) | ASBCA Nos.   61769, 61873, 62391 |
|   Corporation | ) | |
| | ) | |
| Under Contract No.   CQ-12077 | ) | |

APPEARANCES FOR THE APPELLANT:    Franklin C. Turner, Esq.
Ethan M. Brown, Esq.
Cara A. Wulf, Esq.
Alexander W. Major, Esq.
Matthew Wright, Esq.
  McCarter & English, LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Jon B. Crocker, Esq.
  Chief Counsel
Washington Metropolitan Area
  Transit Authority
  Washington, DC

Eric W. Leonard, Esq.
Tracye Winfrey Howard, Esq.
Attison L. Barnes, III, Esq.
Douglas C. Dreier, Esq.
George E. Petel, Esq.
  Wiley Rein LLP
  Washington, DC

OPINION BY ADMINISTRATIVE JUDGE WOODROW

The Washington Metropolitan Area Transit Authority (WMATA) moves for reconsideration of the Board's July 30, 2020 Opinion,[1] requesting that the Board reconsider two aspects of its opinion:  (1) the Board's grant of partial summary judgment under Count II of Philips Lighting North America Corporation's (Philips) complaint with respect to the payment provision in Contract No. CQ-12077's (the Lighting Contract); and (2) the Board's grant of Philips' motion to strike WMATA's affirmative defense of setoff associated with Philips' alleged performance delay (resp. mot. at 1).  In addition to

---

[1] *Philips Lighting North American Corp.*, ASBCA Nos. 61769, 61873, 62391, 20-1 BCA
    ¶ 37,679.

opposing WMATA's motion, Philips requests an order directing payment of money now due it and for the imposition of sanctions against WMATA for the alleged bad faith in its motion. The motions brought by both parties are denied.

I. Standard of Review

In deciding a motion for reconsideration, we examine whether the motion is based upon newly discovered evidence, mistakes in our findings of fact, or errors of law. *Precision Standard, Inc.*, ASBCA No. 58135, 16-1 BCA ¶ 36,504 at 177,860. A motion for reconsideration does not provide the moving party the opportunity to reargue its position or to advance arguments that properly should have been presented in an earlier proceeding. *See Dixon v. Shinseki*, 741 F.3d 1367, 1378 (Fed. Cir. 2014). The moving party must show a compelling reason why the Board should modify its decision. *ADT Construction Group, Inc.*, ASBCA No. 55358, 14-1 BCA ¶ 35,508 at 174,041.

II. WMATA Fails to Demonstrate that the Board Erred in Interpreting the Payment Provisions of the Contract

In our earlier opinion, we held that the Lighting Contract permitted Philips to receive payment from WMATA of a portion of the savings that WMATA realized through the use of energy efficient lightings installed by Philips, even if the savings were not as high as the "guaranteed savings" referenced in the contract. *Philips Lighting*, 20-1 BCA ¶ 37,679 at 182,926-28. WMATA contends that the Board's interpretation of the payment provisions in the Lighting Contract is inconsistent with the parties' original intent and does not respect the benefit and risk for which the parties bargained (resp. mot. at 4-7). WMATA relies on selectively quoted deposition testimony and other extrinsic evidence to support its contention regarding the allocation of risk under the contract. Specifically, WMATA cites excerpts from several depositions to support its contention that "[a]t the time the Lighting Contract was made, Philips and WMATA shared the same understanding – the Guaranteed Energy Savings was a guarantee." (Resp. mot. at 4)

This argument is flawed in several respects. First, it inappropriately relies upon extrinsic evidence for the proposition that both parties intended the contract to guarantee a certain level of savings or forever forfeit payment if that guarantee was not met. Second, the cited deposition testimony does not demonstrate that Philips shared WMATA's understanding of the payment provisions – instead, the testimony reveals that Philips believed the energy savings to be an estimate. Finally, WMATA's insistence that the Board's interpretation of the Lighting Contract will cause Philips to "receive a windfall of reward without risk" strains credulity (resp. mot. at 3). Indeed, WMATA admits that the effect of its interpretation of the contract "seems extreme if considered in isolation" (resp. mot. at 5).

2

A.  WMATA Cannot Rely Upon Extrinsic Evidence to Create an Ambiguity

In relying upon extrinsic evidence to support its position, WMATA attempts to have it both ways, arguing that the language of the contract unambiguously forecloses payment until the guaranteed savings are met (resp. mot. at 2), while simultaneously arguing that the language is ambiguous and requires consideration of extrinsic evidence regarding the parties' intent (resp. mot. at 7, 9).

Tellingly, WMATA did not contend in its response to Philips' motion for partial summary judgment that the payment provisions were ambiguous (WMATA April 12, 2019 partial summary judgment opp'n at 12-14).  A motion for reconsideration does not provide the moving party the opportunity to advance arguments that properly should have been presented in an earlier proceeding.  *Dixon v. Shinseki*, 741 F.3d at 1378.

The cases WMATA relies upon to support its consideration of extrinsic evidence are inapposite.  For example, *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999), dealt with evidence of trade practice and custom in the interpretation of ambiguous contract terms.  Here, we did not find the contract language to be ambiguous, but instead interpreted in the most reasonable way possible so as to assign meaning to all provisions of the contract (op. at 15).  Indeed, WMATA has not presented any evidence of trade practice or custom to support its interpretation.  Moreover, WMATA cannot rely on extrinsic evidence to create an ambiguity where none exists.  *Metric Constructors*, 169 F.3d at 752; *Coast Federal Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (*en banc*).

WMATA's reliance on *Walsh Grp. Ventures*, ASBCA No. 61222, 20-1 BCA ¶ 37,615, and *L.C. Gaskins Constr. Co.*, ASBCA No. 58550, 15-1 BCA ¶ 36,059, also is misplaced.  In both of these appeals, the Board denied summary judgment on the grounds that the contract language at issue was ambiguous and required the Board to resolve genuine issues of material fact.

Perhaps realizing that its reliance on extrinsic evidence was inconsistent with its position that the Board erred in interpreting the plain language of the contract, WMATA backpedals in its reply brief and argues that its reliance on extrinsic evidence was necessary only to illustrate the flaws in the Board's opinion (WMATA reply at 4).  However, to the extent that WMATA contends that the Board erred in its interpretation of the plain language of the contract, reconsideration is not intended to provide a party with the opportunity to reargue an issue that already has been raised and decided.  *Computer Sciences Corp.*, ASBCA Nos. 56168, 56169, 09-2 BCA ¶ 34,261 at 169,283.

B.  Cited Deposition Testimony Does Not Support WMATA's Contentions

Even if we were to consider extrinsic evidence of the parties' intentions, the deposition testimony cited by WMATA does not support its contention that the parties shared an understanding of the payment provisions – instead, the testimony reveals that Philips believed the energy savings to be an estimate.

For example, exhibit 1 to WMATA's motion is a two-page excerpt from the deposition of William McShane, Philips' Senior Manager for Sustainable Lighting. WMATA cites the deposition to support its claim that "Philips and WMATA shared the same understanding – the Guaranteed Energy Savings was a guarantee" (resp. mot. at 4). However, Mr. McShane's testimony supports a different conclusion – that Philips understood the guaranteed energy savings to be an estimate. When specifically asked whether the guaranteed energy savings was premised on a guarantee, Mr. McShane states:

> Q.  These tables talk about annual guaranteed energy savings and this contract was premised on a guarantee.  Is that correct?
>
> A.  It was about an estimated.  For the proposal, it was all estimated cost, because nobody had the true numbers.

(Resp. mot., ex. 1 at 2)

WMATA next cites to an email from Greg Jones, Philips' project manager for the construction phase, to support the same contention – that the parties shared an understanding that the guaranteed energy level was a guarantee (resp. mot. at 4, citing ex. 2).  In this email, written prior to the completion of the construction phase, Mr. Jones states that the lighting system may have "an annual shortfall of about 1,372,429 kWh, or about 8.8% of our annual payments" (resp. mot., ex. 2).  This demonstrates that Mr. Jones' contemporaneous understanding that Philips' annual payments would be reduced in the event that the energy savings fell short of the guaranteed energy savings set forth in the contract.

Finally, WMATA includes as exhibit 3 an excerpt from Mr. Jones' deposition, in which he testified as a corporate designee.  In that deposition, Mr. Jones has this to say about the guaranteed energy savings set forth in Table 1 to the contract:

> Q.  Why do you say that the guaranteed savings were estimated?
>
> A.  Well, at the time of the proposal it was an estimate.  It was incorporated into the contract as a guarantee.  Not a

4

guarantee that had to be met in order to be paid, but it had to be met to be paid at a hundred percent.

(Resp. mot., ex. 3 at 37)

This colloquy demonstrates that Philips understood that annual payments would be reduced if the lighting system did not achieve the guaranteed level set forth in the contract.

## C. WMATA's Argument Regarding Risk Allocation Misses the Mark

Finally, WMATA insists that the Board's interpretation "reassigns risk to WMATA" (resp. mot. at 13). But WMATA fails to explain exactly how it bears *any* risk under this contract: it has a brand new lighting installation with zero maintenance costs, its energy costs have been dramatically reduced, and it has not paid an extra cent for any of it. Indeed, if we were to adopt WMATA's interpretation of the contract, it presumably would *never* have to pay Philips for the installation and maintenance of the lighting system (resp. mot. at 7).

The Board's interpretation of the payment provisions makes logical sense. Following the installation of the lighting system, WMATA's energy costs were expected to decrease, and the savings that resulted would be paid – over a 10-year period – to Philips as compensation for the installation and maintenance of the lighting system. Contrary to WMATA's contention, it is Philips that bears the risk of underperformance. If the lighting system saves less energy than expected, Philips would be paid less. Conversely, if the lighting system saved more energy than expected, Philips would receive no more than the guaranteed level of installment payments. (Op. at 15)

## D. WMATA's Novel Argument Concerning Installment Payments

WMATA introduces a new argument in its motion for reconsideration. WMATA contends that the "Lighting Contract never describes how to calculate the amount that Philips should be compensated if it falls short of the Guaranteed Energy Savings because the Lighting Contract neither contemplates nor allows any payment in that event." (Resp. reply at 3) WMATA contends that the "Lighting Contract does not contain any formula or any way to calculate the amount allegedly due to Philips" (resp. reply at 6). It further contends that Philips improperly relies on deposition and expert testimony, rather than contractual language, to calculate the amount allegedly due to Philips in the event that the project savings is less than the scheduled installment payment (*id.*).

Nothing prevented WMATA from making this argument in its initial response to Philips' motion for summary judgment, and it is not appropriate to raise it here. *Dixon v. Shinseki*, 741 F.3d 1367, 1378 (Fed. Cir. 2014) ("[m]otions for reconsideration do not

5

afford litigants to take a 'second bite at the apple' or to advance arguments that properly should have been presented in an earlier proceeding"). We nonetheless address this novel argument and conclude that it is meritless.

WMATA's contention that the contract is silent on how to calculate amended installment payments is flatly contradicted by the language of the contract. Paragraph 6, Payment Terms, states in relevant part:

> If the Project savings are less than the scheduled Installment payments, then the scheduled Installment payment(s) for that period are deemed amended to equal the actual Project savings obtained (the "Amended Installment Payments").

(Op. at 12)

As we explained in our previous decision, the contract's payment terms expressly contemplate variances in the semi-annual installment payment amounts (op. at 12-13). Specifically, we said:

> Paragraph 6.a. of the contract defines two distinct terms: "scheduled installment payment," and "amended installment payment." The amount of each "scheduled installment payment" is set forth in "Table 1A: Option Annual Guaranteed Energy Savings and Total WMATA Costs – Philips" . . . .
>
> In contrast, an "amended installment payment" occurs only when the actual project savings for that period is less than the scheduled amount.

(Op. at 12) In that situation, and as expressly set forth in paragraph 6.a., the "amended" installment payment is based on the actual project savings obtained.

WMATA attempts to create confusion surrounding the determination of the amended installment payments by contrasting installment payments (measured in dollars) with energy savings (measured in kWh). WMATA contends that "Installment Payments" pertain to cost savings (measured in dollars), while "Actual Project/energy savings" pertain to energy levels (measured in kWh). (Resp. mot. at 6-8)

Under this novel argument, WMATA's contractual payment obligations would depend on the utility rate – the price per kWh in effect during the period. According to WMATA, even if the lighting system required less energy (measured in kWh) than the "guaranteed" level, WMATA would not be required to pay Philips if the "costs savings"

6

were below the "estimated energy cost to WMATA" set forth in the contract (Table 1A). Thus, according to WMATA, Philips could achieve the "guaranteed" level of energy savings and still not be owed payment. (Resp. mot. at 7-8)

WMATA's contention that its payment obligations rely on a distinction between "Installment Payments" and "Actual Project/Energy Savings" ignores the fact that the parties relied on an agreed-upon imputed utility rate to calculate the "estimated energy cost to WMATA" in Table 1 of the contract.

The conversion of energy savings (measured in kWh) and payments (measured in dollars) is achieved simply by multiplying the energy savings by the utility rate (measured in cents/kWh). In this case, the utility rate readily can be calculated from Table 1A of the contract. There is no hidden formula – just simple mathematics. Pursuant to Table 1A of the contract, WMATA's payment obligations are calculated by multiplying the estimated energy consumption by an agreed-upon utility rate (expressed in cents/kWh) (R4, tab 1 at 5). This imputed utility rate can be ascertained by dividing WMATA's estimated Year 1 energy costs of $685,659 by the estimated energy consumption of 7,376,876 kWh/year, which yields a rate of 9.29 cents/kWh (app. resp. at 18). This rate is increased each year by a 2 percent inflation adjustment (R4, tab 1 at 5).

The contract, therefore, contains all of the information necessary to calculate the amount of amended installment payments due to Philips.

E. WMATA Fails to Identify Any Mistakes in the Board's Factual Findings

In its motion for reconsideration, WMATA spends considerable time attacking Philips' reliance on deposition testimony and documents produced during discovery (resp. reply at 5-6). However, the Board's decision did not rely upon deposition testimony or any form of extrinsic evidence to form its conclusions. To the contrary, the Board based its decision on the plain language of the contract and upon undisputed factual allegations concerning Philips' work on the lighting project and on the status of Philips' unpaid invoices. (Op. at 11-15)

WMATA also contends that the Board erred in making certain factual findings and that its errors "created an ambiguity regarding the contract's installment payment terms" (resp. mot. at 13). We disagree. The cited findings of fact are correct and supported by the language of the contract and WMATA's pleadings even if they do not include extraneous details that WMATA wishes us to include to support its arguments.

Specifically, finding 17 in the opinion states in pertinent part:

> After completion of the construction phase, Philips was to be
> paid by WMATA in twenty semi-annual installments over the

ten-year maintenance phase of the contract, from the savings achieved from the project under the contract at Part II, § 2 ¶ 6(a) (R4, tab 1 at 84-85; answer ¶ 21).

*See Philips Lighting*, 20-1 BCA ¶ 37,679 at 182,923. WMATA contends that the contract does not provide that Philips would be paid by WMATA "[a]fter completion of the construction phase," but instead after final completion of the construction phase and after the guaranteed energy savings are verified through the measurement and verification plan (resp. mot. at 12). We agree that the language WMATA cites is contained in the contract, but our decision not to quote the specific language does not make the factual finding any less true, nor does it impact our interpretation of the plain language of the contract.

WMATA next challenges the Board's finding 22, arguing that WMATA is not "required to pay Philips after receipt of a properly completed invoice" as stated in that finding (*see Philips Lighting*, 20-1 BCA ¶ 37,679 at 182,923-24); but rather, Philips is entitled to payment only if it performs its obligations under the contract and submits a properly completed invoice evidencing that performance (resp. br. at 12-13). Again, finding 22 correctly summarizes the obligations set forth in paragraph 7 of the contract, which we quote at length in finding 23.

WMATA's efforts to find fault with the Board's factual findings are nothing more than thinly veiled attempts to re-argue its position on contractual interpretation – specifically, that Philips is not entitled to payment unless the lighting system meets the guaranteed energy savings.

III. WMATA's Claim for Liquidated Damages

WMATA contends that the Board erred as a matter of law when it concluded that WMATA's defense of delay is "tantamount to an affirmative claim for entitlement to liquidated damages" (*Philips Lighting*, 20-1 BCA ¶ 37,679 at 182,928). In its motion for reconsideration, WMATA seeks to rebrand its delay claim as an "affirmative defense of offset for delay." WMATA then contends that an offset against damages is a "classic common-law defense." (Resp. mot. at 14; resp. reply br. at 10-12)

As a threshold matter, we note that WMATA did not raise this argument in its response to Philips' motion for summary judgment. As we previously noted, a motion for reconsideration does not provide the moving party the opportunity to advance arguments that properly should have been presented in an earlier proceeding. *Dixon v. Shinseki*, 741 F.3d at 1378.

WMATA cannot hide from the procedural steps it has taken in this appeal, including its decision to withdraw its counterclaims and its statement that it "intends to

8

issue a contracting officer's final decision with regard to any affirmative claims WMATA has against Philips under the contract" (*see* Withdrawal of Counterclaims & Request for Leave to File Amended Answer in ASBCA No. 61769 (Dec. 18, 2018)). Despite stating more than two years ago that it would issue a final decision, WMATA has not yet done so.

We agree that an offset can be asserted as an affirmative defense. *See Litton Sys., Inc.*, ASBCA No. 36976, 93-02 BCA ¶ 25,705 at 127,891-92 (appellant permitted to raise affirmative defense of offset for additional work it performed against government's reduction in contract's not-to-exceed price). However, WMATA's logic breaks down when it conflates its claim for liquidated damages with an offset. An affirmative claim for liquidated damages is distinct from an offset in that it requires a contracting officer's final decision before it can be raised in an appeal. *Sharman Co. v. United States*, 2 F.3d 1564, 1568-69 (Fed. Cir. 1993), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (*en banc*) (holding a final decision from the contracting officer on the government's monetary claim was a prerequisite to jurisdiction over the claim). Indeed, in *Securiforce Int'l America, LLC v. United States*, 879 F.3d 1354 (Fed. Cir. 2018), the Federal Circuit made the point that, while some affirmative defenses need no government claim as a prerequisite, those which seek payment of money do require a contracting officer's decision. *See* 879 F.3d at 1362 (citing *Raytheon Co. v. United States*, 747 F.3d 1341, 1368 (Fed. Cir. 2014). This is true even when, as in this appeal, the contract is not subject to the Contract Disputes Act. As we explained in our July 30, 2020 opinion, the disputes clause of the Lighting Contract requires that "any dispute concerning a question of fact arising under or related to this Contract . . . shall be decided by the Contracting Officer, who shall reduce his/her decision to writing . . ." (op. at 7, SOF ¶ 25).

WMATA does not mention the disputes clause in its motion for reconsideration, but instead relies on a series of cases to support its contention that a claim for liquidated damages can be raised as an affirmative defense of offset. These cases do not support WMATA's position.

WMATA relies heavily upon *Leal Petroleum Corp.*, ASBCA No. 36047, 92-1 BCA ¶ 24,719, to support its contention that it may raise an affirmative defense without first filing a claim with the contracting officer. *Leal Petroleum* involved a government claim for recoupment of advance payments. *Id*. at 123,380. As an affirmative defense, appellant contended that the government's delay in making advance payments prevented it from obtaining sufficient crude oil to meet the contract's obligations. *Id*. at 123,379. The Board held that Leal was entitled to raise the government's conduct as an affirmative defense, despite the fact that Leal had not filed a claim with the CO for any credit owed to it as a result of the government's alleged conduct. *Id*. at 123,381-82. Although the facts surrounding the government's conduct could have been the basis of a separate affirmative claim, Leal's decision not to file a claim did not prevent it from raising the government's conduct as an affirmative defense to entitlement. *Id*.

9

*Leal Petroleum* offers no support to WMATA in this appeal. Unlike the contractor in *Leal*, WMATA is seeking payment of liquidated damages in a sum certain amount based upon allegations of Philips' delay in completing the lighting system. Rather than merely rely upon the alleged delay as a defense against entitlement, WMATA seeks the payment of money (in the form of liquidated damages) based on the alleged delay. The fact that an award of liquidated damages hypothetically may be offset against the quantum owed to Philips' does not change the essential character of WMATA's claim.

WMATA also relies on *DCX-CHOL*, ASBCA Nos. 61636, 61637, 19-1 BCA ¶ 37,394, for the proposition that a contractor need not assert a claim to the CO in order to assert a common law affirmative defense, unless the defense seeks a change in the terms of the contract (resp. mot. at 14). *DCX-CHOL* involved an appeal of the government's default termination. 19-1 BCA ¶ 37,394 at 181,799. The Board granted the government's motion to strike the contractor's affirmative defenses of delay and constructive change on the grounds that such defenses require the contractor first to assert a claim to the CO. *Id*. at 181,800. *DCX-CHOL* offers no help to WMATA, because, like *DCX-CHOL*, WMATA is seeking to assert an affirmative defense of delay.

WMATA's attempt to fit its delay claim for liquidated damages into the category of common law defenses that do not seek a change in contract terms fails, because WMATA is seeking the payment of money based upon a showing that Philips was responsible for delays in the completion of the lighting system. To prevail in its claim, WMATA must make a factual showing as to both entitlement and quantum for delay damages. Pursuant to the terms of the Lighting Contract, such a claim necessarily involves questions of fact which must first be decided by the contracting officer (op. at 7, SOF ¶ 25).

IV. Whether the Lighting Contract Imposes Current Obligation to Make Amended Installment Payments

In its opposition to WMATA's motion for reconsideration, Philips seeks a ruling from the Board to "clarify for WMATA that the Board's July 30, 2020 Order resolves the issue of WMATA's payment obligations under the Count II and under the Lighting Contract as a matter of law," and that WMATA must stop its withholding of payment to Philips for its outstanding invoices (app. reply at 33 (emphasis in original omitted)).

According to Philips, WMATA has admitted, in sworn interrogatory answers and in its April 12, 2019 Opposition to Philips' Motion for Partial Summary Judgment, that the lighting system is providing at least 91-92 percent of the guaranteed energy savings target of 15,615,828 kWh/year, based on WMATA's unadjusted baseline (app. reply at 29-30). Therefore, Philips contends that it is entitled to immediate payment of at least $4,677,562 (app. reply at 31).

10

In granting partial summary judgment as to the payment obligations of Count II of Philips' complaint, we did not render judgment on the quantum owed to Philips. As we stated in our July 30, 2020 Opinion, "the factual dispute regarding the calculation of the baseline and whether Philips has met the guaranteed savings level safely can be deferred to the quantum phase of this appeal." (Op. at 15) Indeed, Philips' prayer for relief in its Second Amended Complaint seeks payment for a different amount – $5,714,334.88 – than the amount it seeks here – $4,677,562 (app. reply at 31). Philips explains that the lower amount is based on "WMATA's admissions and interpreting the third-party energy consumption data in the light most favorable to WMATA," and that it reserves its right to seek its full measure of damages under the Lighting Contract (*id.*). Philips concedes that the final quantum will be determined at trial (app. reply at 31, n.14).

Philips' request for immediate payment of some amount of damages is based upon testimonial evidence, purported admissions in pleadings, and data provided by a third party. We have had no opportunity to review or judge the credibility of any of these factual matters, and it is inappropriate to do so in the context of a motion for reconsideration of a ruling on a motion for partial summary judgment. Indeed, Philips' motion for partial summary judgment, which it filed before discovery commenced, stated that "Philips is neither seeking a determination nor submitting its evidence on the issue of damages quantum at this stage" (Philips February 28, 2019 mot. for partial summary judgment at 40).

The factual bases for Philips' damages calculations deserve to be fully explored with the benefit of testimony at a hearing. Therefore, because there are significant factual matters that must be decided, we decline to issue a judgment on quantum at this stage of the appeal.

V. Whether Sanctions Should be Imposed on WMATA

In its response to WMATA's motion for reconsideration, Philips also asks that the Board consider imposing sanctions on WMATA pursuant to Board Rule 16 (app. reply at 20). Philips cites a series of allegedly bad faith actions taken by WMATA's counsel in this litigation, including WMATA's decision to file "this meritless, dilatory Motion in a naked attempt to dodge the Board's July 30, 2020 Order and avoid making interim amended installment payments to Philips" (app. reply at 22).

Sanctions are not warranted in this situation. First, this appeal is subject to the Board's 1973 rules under the terms of the memorandum of understanding governing the Board's consideration of WMATA appeals (Bd. corr. ltr. dtd. March 18, 2019). As

WMATA notes, the Board's 1973 rules do not contain an equivalent provision to Board Rule 16.[2]

Additionally, even if we were to consider imposing sanctions pursuant to Rule 16 of the Board's 2014 rules, that rule provides for sanctions only "[i]f any party fails to obey an order issued by the Board, the Board may impose such sanctions as it considers necessary to the just and expeditious conduct of the appeal." Bd. Rule 16. Here, Philips has failed to identify any specific order that WMATA has failed to follow. To the extent that Philips contends that WMATA failed to obey the Board's July 30, 2020 Order by filing a motion for reconsideration of that order, the Board's 1973 rules expressly allow parties to file motions for reconsideration. Br. Rule 29 (1973). In the typical course of events, such as those presented here, if the motion lacks merit, the appropriate response is to deny the motion, not impose sanctions upon the filing party. Moreover, even if sanctions were appropriate in a case of bad faith (a matter over which we express no opinion here), we find none in the present circumstances. Therefore, we decline to impose sanctions on WMATA.

Dated: March 11, 2021

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[2] Because we decline to impose sanctions here, we express no opinion regarding whether the 1973 rules give us the discretion to impose sanctions where warranted.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61769, 61873, 62391, Appeals of Philips Lighting North American Corporation, rendered in conformance with the Board's Charter.

Dated:  March 11, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals